UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ANTOINETTE VIOLA MCNEIL-COWARD &
BARRY DAVIS,

                              Plaintiffs,                      **MEMORANDUM OF**
                                                                              **DECISION AND ORDER**
   –against–                                                16-CV-05424 (LDH) (RLM)

MARK PALTEROVICH a/k/a MIKHAIL
PALTEROVICH a/k/a MICHAIL PALTEROVICH
a/k/a MARK PALTER; SEAN DURRANT; WESSAM
ALIM a/k/a WESLEY ALIM a/k/a WSE ALIM a/k/a
WESSAN SAMY ALIM; HECTOR PASSINI;
NATHAN PINKHASOV; MENEZ JEAN-JEROME;
ELLIOT BAKST; MIRNA WHITE; US LEGAL
ASSET ADVISORS, INC.; KINGS ACQUISITIONS,
INC.; SIXTYEIGHT CORP.; ELITE PROPERTY
ACQUISITIONS, INC.; WCS LENDING,
LLC; WELLS FARGO BANK, N.A.; & MORTGAGE
ELECTRONIC REGISTRATION SYSTEM, INC.,

                              Defendants.

------------------------------------------------------------------x
LaSHANN DeARCY HALL, United States District Judge:

       Plaintiffs Antoinette Viola McNeil-Coward and Barry Davis, bring this action against Defendants Mark Palterovich, Sean Durrant, Wessam Alim, Hector Passini, Nathan Pinkhasov, Menez Jean-Jerome, Elliot Bakst, Mirna White, US Legal Asset Advisors, Inc. ("USLAA"), Kings Acquisitions, Inc., Sixtyeight Corp., Elite Property Acquisitions, Inc., WCS Lending, LLC, Wells Fargo Bank, N.A. ("Wells Fargo"), and Mortgage Electronic Registration System, Inc. ("MERS").[1] Plaintiffs allege that Defendants conspired to defraud and defrauded Plaintiffs

---

[1] On March 28, 2017, by stipulation, this action was dismissed with prejudice as to Continental Mortgage Bankers, Inc. (Stipulation, ECF No. 37.) On November 13, 2017, by stipulation, this action was dismissed with prejudice against Defendant Emery Federal Credit Union. (Stipulation, ECF No. 62.)

1

through a mortgage foreclosure scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Real Estate Settlement Procedures Act ("RESPA"), the Truth in Lending Act ("TILA"), and several state laws. Defendants Wells Fargo, MERS, and Pinkhasov move pursuant to Federal Rule of Procedure 12(b)(6) to dismiss Plaintiffs' complaint in its entirety.[2]

## I. BACKGROUND

Plaintiffs are domestic partners, who have been living together for twenty years. (Compl. ¶¶ 5, 104, ECF No. 1.) According to the complaint, Plaintiff McNeil-Coward was the sole owner of a home located at 830 Brooklyn Avenue, Brooklyn, New York (the "Residence"), which was secured by a mortgage through HSBC Bank, USA, Inc. (*Id.* ¶¶ 105, 107.) Due to failing health and loss of employment, Plaintiff McNeil-Coward entered into default on the mortgage. (*Id.* ¶ 108.) Subsequently, Plaintiff McNeil-Coward applied for and obtained a loan modification, but she was still unable to maintain the scheduled payments. (*Id.* ¶ 109.)

In January 2012, Plaintiff McNeil-Coward contacted Defendant USLAA to schedule a meeting to discuss mortgage options. (*Id.* ¶¶ 110–11.) Plaintiffs allege that in the initial meeting, employees of Defendant USLAA—Defendants Palterovich and Durrant—promised that they would stop any foreclosure action, improve Plaintiffs' credit, and provide Plaintiffs with money for much-needed home repairs. (*Id.* ¶ 114.) Following the meeting, Plaintiffs allege that Defendants Palterovich and Durrant called them to sign papers, but did not provide any detail as to which papers would be signed. (*Id.* ¶ 116.) Further, on several occasions, Defendants Palterovich and Durrant showed up unannounced to Plaintiffs' home and pressured Plaintiff McNeil-Coward to sign "some papers." (*Id.* ¶¶ 117, 119.) Each time, Plaintiff McNeil-Coward

---

[2] Defendants Wells Fargo and MERS also move pursuant to Rule 56 for summary judgment. However, this Court need not assess those arguments at this time.

refused to sign the papers until she fully understood "exactly what would be happening." (*Id.* ¶ 118.) At some point, to "start the process," Plaintiffs paid a $1,000 retainer fee and permitted Defendants Palterovich and Durrant to copy their personal identification documents. (*Id.* ¶¶ 120–22.)

At a subsequent meeting, Defendants Palterovich and Durrant purportedly pitched the following buyback scheme. (*Id.* ¶ 125.) Plaintiff McNeil-Coward would transfer the Residence to a third-party investor, who would procure a new mortgage on the home and use the funds to transform the second floor of the Residence into two separate apartments. (*Id.*) After one year, Plaintiff McNeil-Coward would exercise a right to repurchase the Residence, pursuant to a "buy-back agreement." (*Id.*) Then, Plaintiff could apply any income from renting the two upstairs apartments to remaining expenses on the Residence. (*Id.*) According to the complaint, Plaintiff McNeil-Coward asked Defendants Palterovich and Durrant why the transfer to a third-party investor was necessary; and, they explained to Plaintiff that their proposed solution "was the only way they could save her home from foreclosure" because "of her bad credit, the fact that she was in arrears, and had already obtained a loan modification." (*Id.* ¶ 126.) Despite Defendants Palterovich and Durrant's assurances that, in one year, the Residence would be "100% hers again," Plaintiff "was wary." (*Id.*)

In February 2012, Plaintiffs allege that while Plaintiff McNeil-Coward was hospitalized and medicated, Defendants Palterovich and Durrant came to the hospital with the Contract of Sale (the "Contract"). (*Id.* ¶¶ 129, 131.) The top of the Contract states, "CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT." (Compl. Ex. J, ECF No. 1-10.) The terms of the contract provide that Plaintiff McNeil-Coward would sell the Residence to Defendant Alim and Plaintiff Davis for $450,000. (Compl. ¶ 131.) In addition, the Contract lists

3

Defendant Jean-Jerome as the attorney for the seller and Defendant White as the attorney for the purchasers. (Compl. Ex. J.) Notwithstanding the Contract's express representations, Plaintiffs signed the agreement with knowledge that they did not consult with an attorney. (Compl. ¶¶ 132–34.) Following the Contract's execution, Plaintiffs moved out of the Residence. (*Id.* ¶ 139.)

On April 11, 2012, the U.S. Attorney for the Southern District of New York announced that a mortgage loan officer employed by Defendant USLAA pled guilty for his role in a $9 million dollar mortgage fraud scheme. (*Id.* ¶ 24.) And, a sentencing memorandum indicated that Defendant Durrant hired the employee with the knowledge that he had an indictment pending. (*Id.* ¶ 25.)

On April 24, 2012, the closing for the sale of the Residence was held at Defendant Pinkhasov's office. (*Id.* ¶¶ 140–41.) At the closing, Defendant MERS acted as the nominee of the mortgage loan originator and Defendant Wells Fargo served as the assignee of the promissory note. (Compl. Ex. G, ECF No. 1-7; Compl. Ex. H, ECF No. 1-8.) Plaintiffs allege that they did not meet the attorneys who would be representing their interests until the closing. (Compl. ¶¶ 142–44, 146.) Further, Plaintiffs allege that though present, their attorneys did not explain any of the closing documents to them. (*Id.* ¶¶ 144, 146, 148.) Instead, the attorneys "merely handed the documents to [them] and indicated where [they] should sign." (*Id.* ¶¶ 144, 146.) Thus, Plaintiffs did not understand the significance of any documents that they signed. (*Id.* ¶ 148.) The complaint also alleges that Plaintiff McNeil-Coward asked three questions. *First*, she inquired as to why some of the documents bore her forged signature. (*Id.* ¶ 145.) In response, Defendant Jean-Jerome allegedly assured her that "it was all routine." (*Id.*) *Second*, after Plaintiff Davis observed Defendant Palterovich handing to Defendant Alim a large

4

envelope of cash, Plaintiff McNeil-Coward asked why she did not receive payment upon closing. (*Id.* ¶¶ 150–51.) And, Defendants Palterovich and Durrant allegedly assured her that "everything would work out." (*Id.* ¶ 151.) *Third*, Plaintiff McNeil-Coward questioned the absence of the "buy-back agreement," to which Defendant Palterovich told her it would be "forthcoming." (*Id.* ¶ 152.)

On May 16, 2012, Plaintiffs allege that Defendant Palterovich presented to them a Joint Venture Agreement (the "JV Agreement"). (*Id.* ¶ 153.) The JV Agreement's stated purpose was to form a partnership that will acquire properties "to be sold shortly thereafter to a suitable buyer for maximum profit benefiting this partnership." (Compl. Ex. L, ECF No. 1-12.) It made no mention of either the Residence or the alleged "buy-back agreement." Nevertheless, Plaintiffs allege that they believed the JV Agreement provided for the "buy-back agreement" and signed the JV Agreement. (Compl. ¶ 154.)

Subsequently, a series of assorted events led to Plaintiffs' suspicion that something "was very wrong." (*Id.* ¶¶ 156–63.) In April 2016, their suspicions were confirmed: Defendant Alim commenced a partition action "seeking a sale of the home and distribution of the proceeds." (*Id.* ¶¶ 7, 164.) According to Plaintiffs, the partition action placed them in danger of losing their home and living in debt for the remainder of their lives. (*Id.* ¶ 168.) As such, on September 29, 2016, Plaintiffs commenced the instant action against Defendants seeking relief.

## II. STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a

5

"reasonable inference" of a defendant's liability for the alleged misconduct. *Id*. While this standard requires more than a "sheer possibility" of a defendant's liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

### III. DISCUSSION

#### A. Federal Claims

Defendants Wells Fargo, MERS, and Pinkhasov argue that the complaint fails to set forth an actionable federal claim because, among other reasons, each federal cause of action is time-barred. The Court agrees.

##### 1. RICO Claims

Counts One and Two of Plaintiffs' complaint raise claims under RICO. Each of these claims is subject to a four-year statute of limitations. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012). In assessing when the limitations period begins to run, courts in the Second Circuit have adopted what is known as an injury discovery rule. *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998). Under this rule, the statute of limitations clock begins to run when the plaintiff sustained the alleged injury. *Id.* at 59. That is, when the plaintiff discovered or should have discovered the injury. *Id.* In determining when a plaintiff should have discovered the injury, the Court looks for inquiry notice—"notice such that a 'reasonable investor of ordinary intelligence would have discovered the existence of the fraud.'" *Id.* at 60. (citing *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993)). Significantly, this assessment

is undertaken under an objective standard of all of the circumstances relevant to the allegation of harm. *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105,114 (S.D.N.Y. 2011) ("Determining whether a plaintiff had 'inquiry notice' is judged using an objective standard, requiring evaluation of all relevant circumstances."), *aff'd*, 699 F.3d 141 (2d Cir. 2012). Moreover, a court may find inquiry notice as a matter of law only where the undisputed facts demonstrate when a plaintiff has been placed on notice. *Id.* It is true, as Plaintiffs note, that generally a determination whether a plaintiff is placed on inquiry notice is best suited for the trier of fact. *Id.* However, where, as here, the complaint includes allegations leaving little to no doubt on the issue, dismissal as a matter of law is appropriate. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362 (2d Cir. 2013) ("Although determining whether a plaintiff had sufficient facts to place her on inquiry notice is often inappropriate for resolution on a motion to dismiss, we have found dismissal appropriate [w]here. . . the facts needed for determination of when a reasonable [plaintiff] of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers. . . integral to the complaint.").

Here, Plaintiffs complain that they were injured when ownership to the Residence was transferred to Defendants, absent a "buy-back agreement," thereby depriving them of valuable property and causing unspecified injuries. (Compl. ¶ 174.) Thus, the injury occurred on the date of the closing—April 24, 2012. As pleaded, Plaintiffs were unaware on this date that they had been fully divested of ownership in the Residence without a right to later repurchase it. According to the complaint, Plaintiffs inquired as to the "buy-back agreement" and were assured that it would be forthcoming. (*Id.* ¶ 152.) Viewing the complaint in the light most favorable to Plaintiffs, these allegations are sufficient to conclude that the statute of limitations had not begun

to run on April 24, 2012.³  This conclusion does not, however, shield Plaintiffs' complaint from dismissal.

By May 16, 2012, the date the JV Agreement was executed, and over four years before the instant action was commenced, Plaintiffs should have discovered the alleged harm. According to the complaint, Plaintiffs understood that the JV Agreement executed on May 16, 2012, constituted the "buy-back agreement" and hence it was only after the one-year period in which the buy back was set to occur that they could have discovered the alleged fraud. (*Id.* ¶ 154.)  This is simply not reasonable.  On its face, the JV Agreement's stated purpose was to acquire unspecified properties "to be sold shortly thereafter to a suitable buyer for maximum profit benefiting this partnership." (Compl. Ex. L.)  It included no provision that could be conceivably construed as conveying any right to Plaintiffs in repurchasing the Residence. Indeed, the JV Agreement made no reference to the Residence whatsoever.  In other words, the JV Agreement itself should have placed Plaintiffs on notice of the alleged injury.  Moreover, Plaintiffs do not allege that in the face of this JV Agreement, they made any inquiry as to the omission of the "buy-back agreement's" terms.  The only reasonable inference that can be drawn is that had such inquiry been made, the alleged fraud would have been revealed.  As such, for statute of limitations purposes, Plaintiffs should have known about the alleged injury on or before May 16, 2012.  *See e.g.*, *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)("[W]here

---

³ That said, there were several "storm warnings" that occurred even prior to the closing that arguably should have alerted Plaintiffs that something was afoot.  Under law, the clock "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009) (summary order). Here, Plaintiffs alleged, for example that: (1) Defendants Palterovich and Durrant repeatedly pressured Plaintiffs into the transfer, (2) Defendants Palterovich and Durrant's explanation for why the transfer was necessary made Plaintiff McNeil-Coward "wary," (3) the Contract indicated that Plaintiffs were represented by attorneys, whom they contend they never met, (4) at the closing Plaintiff McNeil-Coward noticed that her signature had been "forged" on several documents, (5) Plaintiff Davis noticed that Defendant Alim received a large envelope of cash, while Plaintiff McNeil-Coward received no compensation, and of course, (6) the closing documents did not include the agreed upon "buy-back agreement." (Compl. ¶¶ 117–19, 126, 132–34, 142–152.)

8

the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.").[4]

### 2. RESPA and TILA Claims

Counts Three and Four raise claims under RESPA and TILA, respectively. Here, too, the claims are time barred. Under TILA, claims must be commenced within one-year of the date of the loan. *See Cardiello v. The Money Store*, 29 F. App'x 780, 781 (2d Cir. 2002) (summary order) (holding that appellants' TILA claim was barred by the one-year statute of limitations); *see also Kelmetis v. Fed. Nat'l Mortg. Ass'n*, No. 16-CV-00246, 2017 WL 395120, at *6 (N.D.N.Y. Jan. 27, 2017) ("Thus, in closed-end credit transactions, like the one at issue, the date of the occurrence of violation is no later than the date the plaintiff enters the loan agreement or, possibly, when defendant performs by transmitting the funds to plaintiffs."). Similarly, RESPA claims must be commenced within one or three years of the loan date, depending on the section of the act invoked. *See* 12 U.S.C. § 2614; *see also Done v. Option One Mortg.*, No. 09-CV-4770, 2011 WL 1260820, at *8 (E.D.N.Y. Mar. 30, 2011) ("The statute of limitations for plaintiff's [RESPA claim] began to run when plaintiff signed the Loan Document."). Curiously, Plaintiffs do not specify which section of the RESPA statute is claimed to have been violated.

---

[4] The cases relied upon by Plaintiffs do not warrant a different finding. In those cases, the plaintiffs had no reason to suspect fraud. *See Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 462 (S.D.N.Y. 2015) ("While it is true that Hilti could have sought an independent opinion or contacted the Rothko experts mentioned by Freedman, it had no reason to suspect the authenticity of their painting at that time."); *see also Liberty Ins. Corp. v. Leonid (Lenny) Brenman*, No. 14-CV-5892, 2016 WL 880170, at *3 (E.D.N.Y. Mar. 1, 2016) ("Putting aside the fact that five of the plaintiffs in this action were not parties to the Queens County action—in which Dr. Arnoff, the lynchpin of the alleged Austin Diagnostic RICO enterprise, was not even mentioned—the singular, vague statement that 'there [were] issues' as to whether Austin Diagnostic was properly incorporated hardly establishes that Liberty Mutual had notice in February 2010 of the fraudulent scheme now alleged.").

However, for the sake of argument, the Court will presume that Plaintiffs' claims invoke Section 2605, which enjoys the longer three-year limitations period. *See* 12 U.S.C. § 2614. Nevertheless, the Court's conclusion remains unchanged. The complaint in this case was brought on September 29, 2016, over four years after the closing of the loan. The RESPA and TILA claims are patently untimely.

Plaintiffs seek to save their claims from dismissal by arguing that the claims are subject to equitable tolling. Equitable tolling is warranted where "the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003), *as amended* (July 29, 2003). There are simply no allegations in the complaint to support tolling. As discussed above, there are no allegations that Plaintiffs made any effort that may have led to the discovery of the alleged fraud. *See e.g.*, *Williams v. Aries Fin.*, LLC, No. 09-CV-1816, 2009 WL 3851675, at *9 (E.D.N.Y. Nov. 18, 2009) (finding no reasonable diligence where the existence of a subordinate mortgage was or should have been known to plaintiff because she signed the paperwork authorizing the mortgage and failed to include any allegations that she asked questions, was lied to, or took reasonable steps to discover the agreement's purpose). The complaint is also devoid of any allegations that Plaintiffs took any efforts to file a claim or otherwise seek judicial relief during the period they seek to be tolled. *See e.g.*, *Zerilli-Edelglass*, 333 F.3d at 80 ("Equitable tolling is generally considered appropriate where the plaintiff actively pursued judicial remedies but filed a defective pleading during the specified time period."). Moreover, Plaintiffs do not allege any extraordinary circumstance that might excuse their failure to timely file a complaint. Although Plaintiff McNeil-Coward's

alleged medical conditions may engender the Court's sympathy, they are not alleged to have prevented her from filing a complaint. *See e.g.*, *Estate of Mandarino v. Mandarino*, 699 F. Supp. 2d 646, 652 (S.D.N.Y. 2010), *aff'd sub nom. Mandarino v. Mandarino*, 408 F. App'x 428 (2d Cir. 2011) ("In the end, a plaintiff seeking equitable tolling must demonstrate that her particular disability severely impair[ed] her ability to comply with the filing deadline, despite her diligent efforts to do so."). They certainly could not have operated to prevent Mr. Davis from doing so.

**B.     State Law Claims**

The remaining counts of Plaintiffs' complaint are grounded in state law. Having dismissed Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over these remaining claims pursuant to 28 U.S.C. § 1367(c)(3). Thus, these claims are dismissed without prejudice for lack of subject matter jurisdiction.

### IV. CONCLUSION

For the reasons set forth above, Defendants Wells Fargo, MERS, and Pinkhasov's motions to dismiss are granted. Counts One, Two, Three, and Four against the aforementioned parties are dismissed with prejudice. The remaining counts are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate this action as to Defendants Wells Fargo, MERS, and Pinkhasov.

Dated: Brooklyn, New York                            SO ORDERED:
       March 26, 2018

                                                                  /s/LDH
                                                     LaSHANN DeARCY HALL
                                                     United States District Judge